THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RADMILA PAVLOVIC, et al.          *

         Plaintiff          *

      vs.          *     CIVIL ACTION NO. MJG-13-983

UNIVERSITY OF MARYLAND          *
BALTIMORE COUNTY, et al.
                     *

        Defendants
*     *     *     *     *     *     *     *     *

<u>MEMORANDUM AND ORDER RE: MOTION TO DISMISS</u>

The Court has before it Defendants', University of Maryland
Baltimore County, Board of Regents of the University System of
Maryland, and Chris Geddes, Ph.D., Motion to Dismiss [Document
3], and the materials submitted relating thereto.  The Court
finds a hearing unnecessary.


I.     <u>BACKGROUND</u>

At all times relevant hereto, Defendant University of
Maryland Baltimore County ("UMBC") has been a part of the
University System of Maryland governed by the Defendant Board of
Regents, ("the Board").  Defendant Chris Geddes, Ph.D.
("Geddes") was the Director of the Institute of Fluorescence
("IOF") at UMBC and Defendant Caroleann Aitken ("Aitken"), the
wife of Geddes, was the Administrator of the IOF.

From 2009 to 2012, Plaintiff Radmila Pavlovic ("Pavlovic")
was a research assistant for Geddes.  From 2010 to 2012,

Plaintiff Sheena Young ("Young") was a graduate student in Geddes' laboratory.

Pavlovic, a Caucasian female of Serbian national origin, and Young, an African-American female, allege that Geddes and Aitken engaged in a pervasive pattern of discrimination and retaliation against them and other similarly situated research assistants and students on the basis of their race, gender, and national origin, culminating in Pavlovic's and Young's wrongful dismissal from UMBC.

In the Complaint [Document 1] Plaintiffs present claims in seven Counts:

| | |
|---|---|
| Count I | Title VII of the Civil Rights Act of 1964 (Plaintiff Pavlovic) (all Defendants); |
| Count II | Title VI of the Civil Rights Act of 1964 (Plaintiff Young) (all Defendants); |
| Count III | Title IX of the Educational Amendment of 1972 (Plaintiffs Young and Pavlovic) (all Defendants); |
| Count IV | 42 U.S.C. § 1983 (Plaintiffs Young and Pavlovic) (all Defendants); |
| Count V | Wrongful Termination/Implied Contract (Plaintiff Pavlovic) (all Defendants); |

| Count VI | Defamation of Character (Plaintiffs Young and Pavlovic) (Defendants Geddes and Aitken); and |
|----------|--------------------------------------------------------------------------------------------------|
| Count VII | Intentional Infliction of Emotional Distress (Plaintiffs Young and Pavlovic) (all Defendants). |

By the instant motion, Geddes, UMBC, and the Board[1] seek dismissal of certain of the claims asserted against them pursuant to Federal Rule of Civil Procedure 12(b)(6).


II.  <u>DISMISSAL STANDARD</u>

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6)[2] tests the legal sufficiency of a complaint. A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (citations omitted).  When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-

_____

[1]  Aitken has not joined the instant motion, possibly because she has not been served and chooses not to appear voluntarily.

[2]  All "Rule" references herein are to the Federal Rules of Civil Procedure.

3

pleaded allegations are accepted as true and the complaint is
viewed in the light most favorable to the plaintiff.  However,
conclusory statements or a "formulaic recitation of the elements
of a cause of action" will not suffice.  Id.  A complaint must
allege sufficient facts to "cross 'the line between possibility
and plausibility of entitlement to relief.'"  Francis v.
Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly,
550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim
is "a context-specific task that requires the reviewing court to
draw on its judicial experience and common sense."  Id.  Thus,
if the well-pleaded facts contained within a complaint "do not
permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged – but it has not shown –
that the pleader is entitled to relief."  Id. (quoting Ashcroft
v. Iqbal, 556 U.S. 662, 679 (2009)) (internal quotation marks
omitted).

III. <u>DISCUSSION</u>

    A.  <u>The "Facts"[3] as Alleged by Plaintiffs</u>

Geddes, as the Director of the IOF, oversaw a laboratory with research assistants and graduate students. In 2009, UMBC hired Pavlovic – who held a temporary student visa that allowed her to work in the United States for one year - as a research assistant in the IOF laboratory. Geddes required Pavlovic, but not non-foreign research assistants, to perform menial tasks, such as washing garbage cans, which were outside the scope of her duties as a research assistant. Geddes warned Pavlovic and other foreign research assistants working on visas that they would be fired if they complained to UMBC's Human Resources Department or anyone else about anything going on in the IOF Department.

In 2010, Young became a graduate student in the IOF laboratory and formed a friendship with Pavlovic and a few other IOF research assistants and students of foreign origin. In March 2011, Young and other students complained to officials at UMBC that Geddes and Aitken were mistreating and discriminating

---

[3]    The Defendants, of course, do not necessarily agree with Plaintiffs' version of the pertinent facts.

against foreign research assistants and graduate students who were working in the IOF laboratory on visas. Specifically, Young complained that Geddes used such persons' visa status as a means of differential treatment and control, reminding the "visa persons" that he sponsored their visas and thus had the power to affect their right to stay in the United States. Young claims to have observed Geddes and Aitken berate and degrade a foreign graduate student, "threatening his visa status in the country and discussing it publicly in the laboratory." Compl. ¶ 20.

After Young began making noise about the treatment of the "visa persons", Geddes and Aitken instructed Pavlovic not to socialize with Young, told Pavlovic she would be fired if she supported Young, and warned Pavlovic that even if she did complain, no one would believe her. In early April 2011, Young made additional written and verbal complaints to the department chair about Geddes' mistreatment of the "visa persons" in the IOF laboratory. After learning of these complaints, on April 16, 2011, Geddes verbally threatened to discharge Young from the IOF laboratory. While Young remained a student at UMBC after the conversation with Geddes, Geddes implemented a plan to get her kicked out of the graduate program at UMBC, which ultimately

succeeded: Young was dismissed from the program on May 21, 2012. On that same date, Pavlovic returned from an approximate three-week visa-related trip to Serbia to discover what had happened to Young.

Thereafter, Aitken falsely informed Pavlovic that Young had complained that Pavlovic had improperly used her identification card to gain access to the laboratory and had tried to marry Young's boyfriend for an illegal green card. Aitken went on to advise Pavlovic that if UMBC's Human Resources Department heard of such things, Pavlovic would be terminated. Aitken further threatened that if Pavlovic did not cut off communication with Young, she would be fired. Pavlovic advised Aitken that she would not discontinue her relations with Young. Less than one month later and two weeks before Pavlovic's employment contract was to be renewed by UMBC, Geddes informed her that he would not renew her contract because he "'was not happy with [her] scientific progress'" and "'saw [her] surfing the internet several times.'" Compl. [Document 1] ¶ 16. However, Geddes offered Pavlovic a two-month contract to allow her to search for other employment.

B.  <u>Ability to Sue the Board</u>

Plaintiffs allege that the Board is the entity that governs the University System of Maryland, of which UMBC is a constituent institution.  Compl. at 3.  The Board contends that it has no direct role in the operation of UMBC and/or statutory authority to make academic or employment decisions at UMBC. Plaintiffs disagree, arguing that the Board controls and approves the policies and procedures prohibiting discrimination at UMBC and is thus responsible when those controls fail as alleged in the Complaint.

According to the Education Article of the Maryland Code, the University System of Maryland is an "instrumentality" of Maryland and an "independent unit of State government", the government of which is vested in the Board, which consists of 17 members.  <u>See</u> Md. Code Ann., Educ. § 12-102.  The Board "[i]s responsible for the management of the University System of Maryland and has all the powers, rights, and privileges that go with that responsibility"; and may "[s]ue and be sued . . . in all courts."  <u>Id.</u> § 12-104(b)(3), (c)(1).  By statutory directive, the Board "shall delegate to the president of each constituent institution authority needed to manage that

institution." Id. § 12-104(k)(1)(ii). However, the Board

maintains responsibility to "develop policies and guidelines

that . . . [p]rovide direction to the presidents of the

constituent institutions on compliance with applicable law and

policy." Id. § 12-104(k)(3)(i).

As provided by statute, the president of UMBC is the "chief

executive officer of the institution"; is "responsible and

accountable to the Board for the discipline and successful

conduct of the institution and supervision of each of its

departments"; and "serves at the pleasure of the Board of

Regents." Id. § 12-109(c), (d)(1)-(2).

As stated in a recent decision by Judge Quarles of this

Court, involving the Board and UMBC:

> The Board asserts that from this
> structure, it is not responsible for any
> violations of the ADA by UMBC. Other than
> the statute, it has not provided any
> authority for this proposition, nor has the
> Court found any. Although the Board's
> management of UMBC has been delegated to
> Hrabowski by statute, see Md. Code Ann.,
> Educ. § 12-104(k)(1), the statute is equally
> clear that the Board retains ultimate
> responsibility for the entire University
> System. See id. §§ 12-104(c)(1), 12-
> 109(d)(2). Combined with the Board's
> capacity to "sue and be sued," id. § 12-

104(b)(3), these provisions indicate that the Board is a proper defendant in this case. Accordingly, the motion to dismiss will be denied.

Jean v. Bd. of Regents of Univ. Sys. of Md., CIV. WDQ-13-0117, 2013 WL 3873948, at *2 (D. Md. July 24, 2013) (footnotes omitted).

In the instant case, Plaintiffs allege that the Board knew of Geddes' and Aitken's alleged misconduct, failed to take any remedial action, and tolerated their behavior because the Department headed by them is heavily funded by outside philanthropic entities. Compl. at 4-5.

While, in the absence of appellate precedent the issue may not be free from doubt, this Court finds Judge Quarles' decision persuasive and holds that the Plaintiffs are not statutorily barred from proceeding on their claims against the Board.

C.   Federal Discrimination Claims Against Geddes
      Individually (Counts I, II, and III)

In Counts I, II, and III Plaintiffs assert federal claims against Geddes in his individual and official capacities for

violations of Title VII (employment discrimination), Title VI (educational discrimination), and Title IX (educational discrimination), respectively. Plaintiffs agree that these claims are not properly brought against a supervisor in his individual capacity.[4]

Accordingly, all claims in Counts I, II, and III against Geddes in his individual capacity shall be dismissed.


     D.    <u>Federal § 1983 Claim Against the Board, UMBC, and Geddes in His Official Capacity (Count IV)</u>

In Count IV, Plaintiffs claim that all of the Defendants violated their rights as guaranteed by the Fourteenth Amendment and federal statutes in violation of 42 U.S.C. § 1983. Plaintiffs agree that these claims are subject to dismissal as against the Board, UMBC, and Geddes in his official capacity

---

[4]    <u>See</u> <u>Lissau v. S. Food Serv., Inc.</u>, 159 F.3d 177, 180 (4th Cir. 1998) (explaining employing entity, not individuals, are liable under Title VII); <u>Farmer v. Ramsay</u>, 41 F. Supp. 2d 587, 592 (D. Md. 1999) (concluding entity rather than individual is proper defendant in Title VI claims); <u>Fitzgerald v. Barnstable Sch. Comm.</u>, 555 U.S. 246, 257 (2009) (explaining Title IX has been interpreted as not authorizing suit against school officials and other individuals).

because the State of Maryland is not a "person" within the meaning of § 1983.[5]

Accordingly, all claims in Count IV against the Board, UMBC, and Geddes in his official capacity shall be dismissed.

E.  State Law Claims (Counts V, VI, and VII)

Plaintiffs assert state law claims for breach of implied contract (Count V) and intentional infliction of emotional distress (Count VII) against all of the Defendants and a defamation claim (Count VI) against Geddes and Aitken.

The Defendants contend the state law claims asserted against the Board, UMBC, and Geddes are barred by the Eleventh Amendment and/or the Plaintiffs' failure to comply with the Maryland Tort Claims Act ("MTCA").  Alternatively, the Defendants assert the factual allegations in the Complaint are

---

[5]    See Stern v. Bd. of Regents, Univ. Sys. of Md., 846 A.2d 996, 1002 (Md. 2004) (concluding the Board is "an arm of the State" and can raise the defense of sovereign immunity); James v. Univ. of Md., Univ. Coll., CIV. PJM 12-2830, 2013 WL 3863943, at *1 (D. Md. July 23, 2013) (concluding in context of § 1981 claim that University of Maryland is considered a state agency); Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (holding "neither a State nor its officials acting in their official capacities are 'persons' under § 1983").

insufficient to support a plausible claim for relief under state law.

### 1.    Eleventh Amendment Immunity

Plaintiffs agree that UMBC, the Board, and Geddes in his official capacity are entitled to Eleventh Amendment Immunity to the state law claims.

The Board and UMBC (as well as their employees in their official capacities) are considered an arm of the State for Eleventh Amendment purposes.  Altevogt v. Kirwan, CIV. WDQ-11-1061, 2012 WL 135283, at *4 (D. Md. Jan. 13, 2012); Palotai v. Univ. of Md. Coll. Park, 959 F. Supp. 714, 716 (D. Md. 1997). The Eleventh Amendment prevents private individuals from suing nonconsenting states, state agencies, and state officials in federal court.  See Bd. of Tr. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001).

Maryland has not waived its sovereign immunity with respect to suits in federal court for state law claims.  Rather, Maryland has created a limited waiver of sovereign immunity in regard to tort claims and actions on written contracts brought in a Maryland state court.  See Md. Code Ann., State Gov't § 12-

104(a)(1) (waiving partially sovereign immunity in certain tort actions in "court of the State"); § 12-201 (waiving partially sovereign immunity in contract action in "court of the State" based on a "written contract that an official or employee executed for the State or 1 of its units").  Because Plaintiffs filed this suit in federal court, the Defendants retain entitlement to Eleventh Amendment immunity.  See Proctor v. Washington Metro. Area Transit Auth., 990 A.2d 1048, 1061 (Md. 2010) (explaining notable feature of MTCA's waiver of sovereign immunity is that Maryland "retains its Eleventh Amendment immunity to suit in federal court").

Accordingly, all claims in Counts V, VI, and VII against the Board, UMBC, and Geddes in his official capacity shall be dismissed.


### 2.   Claims Against Geddes in His Individual Capacity

The Court interprets the Complaint to assert state law claims against Geddes in his individual capacity.

a.   The Maryland Tort Claims Act

The Defendants assert that the state law claims against Geddes in his individual capacity are barred by the doctrine of sovereign immunity because the Plaintiffs have failed to comply with the notice provisions of the MTCA by submitting such claims to the Maryland Treasurer prior to filing suit[6] and there is no plausible claim of malice or gross negligence on part of Geddes capable of obviating the notice mandate.

It does not appear that the Defendants' notice contentions are applicable to a non-tort claim such as the implied contract claim (Count V).  See Md. Code Ann., State Gov't § 12-202.

As to tort claims, the Maryland Court of Appeals has held the MTCA notice requirements inapplicable to the extent a complaint contains sufficient allegations that the defendant acted with malice or gross negligence in connection with the alleged state tort claims.  Barbre v. Pope, 935 A.2d 699, 713-14 (Md. 2007).  Malice refers to "ill-will", "evil or wrongful motive" or "deliberate wrongdoing."  Id. at 714.  When drawing all reasonable inferences in favor of the Plaintiffs, the

---

[6]   All Defendants present this contention, but Geddes in his individual capacity is the only movant not entitled to Eleventh Amendment immunity.

factual allegations in the Complaint present a plausible claim
that Geddes acted maliciously.  That is, Geddes is claimed to
have purposefully discriminated against and mistreated his
research assistant, Pavlovic, on the basis of her national
origin and, after Young complained of his wrongdoing, attempted
to intimidate Pavlovic and Young from associating or making
further claims against him and his wife.

Therefore, there shall be no dismissal of the state law
claims against Geddes due to non-compliance with the MTCA notice
provision.

### b.    Implied Contract Claim (Count V)

Plaintiffs allege that UMBC employed Pavlovic, Geddes acted
as her direct supervisor, and that Pavlovic was wrongfully
terminated in retaliation for supporting Young in breach of her
implied employment contract.  Compl. at 3, ¶ 1, 16.  There are
no factual allegations capable of supporting a cognizable claim
that Geddes, in his individual capacity, employed Pavlovic or
entered into an employment contract with her.

Accordingly, all claims in Count V against Geddes in his
individual capacity shall be dismissed.

c.  <u>Defamation (Count VI)</u>

To plead a claim for defamation under Maryland law, a plaintiff must plausibly allege:  (1) a defamatory communication made to a third party (<u>i.e.</u>, someone other than the plaintiff); (2) the communication was false; (3) the defendant was at fault in communicating the statement; and (4) the plaintiff suffered damages.  <u>Gohari v. Darvish</u>, 767 A.2d 321, 327 (Md. 2001).

Plaintiffs allege that Geddes and Aitken conspired to defame Pavlovic and Young when:

> (1) Aitken falsely told Pavlovic that Young had said she improperly used Young's lab identification card and sought to marry Young's boyfriend to get a green card and

> (2) Geddes and Aitken accused Young of making false claims of national origin discrimination and retaliation.

The first of these alleged defamatory statements was made by Aitken about Pavlovic to Pavlovic, and not to any third party.  Without a plausible defamation claim against Aitken, there is no viable conspirator liability on part of Geddes.  <u>See Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.</u>, 665 A.2d 1038, 1045 (Md. 1995) (explaining civil conspiracy is not an independent tort under Maryland law).  The second of these

17

alleged defamatory statements presents no more than a claim that at some unspecified time, Geddes and Aitken made a false accusation about Young to Young (not to some third person).

Accordingly, all claims in Count VI against Geddes in his individual capacity shall be dismissed.

        d.    <u>Intentional Infliction of Emotional Distress (Count VII)</u>

To establish a cause of action for intentional infliction of emotional distress ("IIED") under Maryland law, a plaintiff must establish four essential elements:

>    (1)   The conduct must be intentional or reckless;
>
>    (2)   The conduct must be extreme and outrageous;
>
>    (3)   There must be a causal connection between the wrongful conduct and the emotional distress; and
>
>    (4)   The emotional distress must be severe.

<u>Batson v. Shiflett</u>, 602 A.2d 1191, 1216 (Md. 1992) (quoting <u>Harris v. Jones</u>, 380 A.2d 611, 614 (Md. 1977)).

The Maryland Court of Appeals has stated that "'[i]n developing the tort of intentional infliction of emotional

18

distress, whatever the relationship between the parties, recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.'" Batson, 602 A.2d at 1216 (quoting Figueiredo-Torres v. Nickel, 584 A.2d 69, 75 (Md. 1991).

Plaintiffs fail to plead the second and fourth of the essential elements of an IIED claim.

In order to satisfy the second element of the tort, the actionable conduct must be truly egregious and must "completely violate human dignity" and "strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." Hamilton v. Ford Motor Credit Co., 502 A.2d 1057, 1064 (Md. Ct. Spec. App. 1986). As explained by the Maryland Court of Special Appeals:

> . . . Although extreme and outrageous conduct may arise from a defendant's abuse of a position, or relation with another person, which gives him actual or apparent authority over him, and the conduct of such a person will be carefully scrutinized by the Courts . . . still, the conduct, to be actionable, must go beyond mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Beye v. Bureau of Nat'l Affairs, 477 A.2d 1197, 1205 (Md. Ct. Spec. App. 1984) (internal citations and quotations omitted).

Plaintiffs allege that Geddes used Pavlovic's visa status as a basis for differential treatment and threatened to fire her if she complained to Human Resources.  After Young started complaining about Geddes' misconduct, he threatened to discharge Young, threatened to fire Pavlovic if she associated or supported Young, and ultimately fired Pavlovic and took action to ensure Young would be dismissed from the graduate program at UMBC.  Geddes' alleged conduct would be far from acceptable. However, even when drawing all reasonable inferences in favor of Plaintiffs, the assertions in the Complaint do not rise to the level of outrageousness that is actionable under Maryland IIED law.  Beye, 477 A.2d at 1204-05 (concluding claim that supervisors gave employee poor performance ratings, threatened to fire him, physically harassed and assaulted him, passed him over for a promotion, and deceived him into resigning did not give rise to a claim of IIED).

To establish the fourth element of IIED a Plaintiff must prove that the emotional distress inflicted was of such severity

that he was unable to function or tend to necessary matters.
Hamilton, 502 A.2d at 1064.

Plaintiffs do no more than present formalistic
generalities. They do not allege facts rendering plausible a
claim that the distress caused by Geddes constituted "a severely
disabling emotional response, so acute that no reasonable man
could be expected to endure it." Moniodis v. Cook, 494 A.2d
212, 219 (Md. 1985) (internal quotations omitted) superseded by
statute on other grounds as stated in Weathersby v. Ky. Fried
Chicken Nat'l Mgmt. Co., 587 A.2d 569, 572-75 (Md. Ct. Spec.
App. 1991); Takacs v. Fiore, 473 F. Supp. 2d 647, 652 (D. Md.
2007) (dismissing IIED claim for failure to plead plausible
claim of severe distress where plaintiff did not allege she was
unable to function on a daily basis); McDaniel v. Md., CIV.A.
RDB-10-00189, 2010 WL 3260007, at *9 (D. Md. Aug. 18, 2010).

In sum, Plaintiffs have failed to plead facts sufficient to
state a plausible claim as to the second and fourth elements of
an IIED claim.

Accordingly, all claims in Count VII against Geddes in his
individual capacity shall be dismissed.

IV.  <u>CONCLUSION</u>

For the foregoing reasons,

1. Defendants', University of Maryland Baltimore County, Board of Regents of the University System of Maryland, and Chris Geddes, Ph.D., Motion to Dismiss [Document 3] is GRANTED IN PART AND DENIED IN PART:

   a. All claims in Counts I, II, and III against Chris Geddes, Ph.D., in his individual capacity are DISMISSED;

   b. All claims in Count IV against the University of Maryland Baltimore County, Board of Regents of the University System of Maryland, and Chris Geddes, Ph.D. in his official capacity are DISMISSED; and

   c. All claims in Counts V, VI, and VII against University of Maryland Baltimore County, Board of Regents of the University System of Maryland, and Chris Geddes, Ph.D. in his individual and official capacities are DISMISSED.

2. The following claims remain pending:

   a. Counts I, II and III against University of Maryland Baltimore County, Board of Regents of the University System of Maryland, and Chris Geddes, Ph.D. in his official capacity and

   b. Count IV against Chris Geddes, Ph.D. in his individual capacity.

3. Plaintiffs shall arrange a case planning and scheduling telephone conference to be held by September 30, 2013.

SO ORDERED, on <u>Tuesday, September 03, 2013</u>.


                              _____/s/_____
                              Marvin J. Garbis

                         United States District Judge